# IN THE COURT OF APPEALS OF IOWA

No. 21-1420
Filed March 30, 2022

**IN THE INTEREST OF J.B.,**
**Minor Child,**

**T.B., Mother,**
　　　Petitioner-Appellant,

**C.B., Father,**
　　　Respondent-Appellee.
_____

　　　Appeal from the Iowa District Court for Polk County, Coleman McAllister,

Judge.


　　　The mother appeals the dismissal of her petition to terminate the father's

rights in a chapter 600A proceeding. **REVERSED AND REMANDED WITH**

**DIRECTIONS.**


　　　Benjamin Folladori of Marberry Law Firm, P.C., Urbandale, for appellant.

　　　Jason T. Carlstrom, Des Moines, for appellee.

　　　Brittany Sandler of Stamatelos & Tollakson, West Des Moines, attorney and

guardian ad litem for minor child.


　　　Considered by Tabor, P.J., Greer, J., and Potterfield, S.J.*

　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**POTTERFIELD, Senior Judge.**

The mother of J.B. appeals the district court's denial of her petition to terminate the father's parental rights under Iowa Code chapter 600A (2021). She contends the petition should have been granted because the father abandoned J.B. within the meaning of section 600A.8(3)(b) and termination of his rights is in J.B.'s best interests. She also maintains she should not be required to pay for the father's appellate attorney fees.

**I. Background Facts and Proceedings.**

The parents were in an on-again, off-again relationship for more than ten years; they never married. During that time, they had a child in 2005 and then J.B., who was born in 2013.[1] The mother also had a child in 2010; this child is not the father's.[2] Both parents, J.B.'s two older siblings, and J.B. lived together from his birth until the parents' relationship ended for good in April 2014—when J.B. was approximately one year old.

In July 2015, the mother married W.B. He shares a close relationship with J.B. and would like to adopt the child.

The mother filed a petition to terminate the father's parental rights in March 2021, and the termination trial took place over two days: June 14 and 25.

The mother, the children, and the stepfather live together in Des Moines. The father—living with his grandmother—also resides in Des Moines. Still, the

---

[1] The mother did not petition to terminate the father's rights to the oldest child, citing the fact that he was already sixteen years old at the time of the termination trial and the oldest child did not want the father's rights to be terminated.

[2] While the middle child has a different biological father, the mother and the father reconciled while the mother was still pregnant with the middle child, and it seems the father and his relatives have always treated the middle child as family.

mother testified the father saw J.B. ten times or less in the year leading up to the trial.[3] She testified the older two children go visit at the great-grandmother's home more often than J.B., who would rather stay home with the mother and stepfather. When the children do visit the great-grandmother's home, it is because the great-grandmother and the mother set up visits—the father takes only a passive role. The mother and stepfather both testified there are times the children return from visits—including visits J.B. attended—and report the father was either not present or was sleeping in the basement throughout their time there. J.B.'s guardian ad litem (GAL) reported to the court that the children made similar statements to her.

In his testimony, the father agreed he does not contact the mother or stepfather for visits but testified his lack of contact is to avoid conflict. He claimed he saw the children from Friday through Monday every weekend for the first couple years after he and the mother ended their relationship before it went to alternating weekends. He maintained they continued alternating weekends until the mother filed the termination petition, at which time she cut off contact. The father testified that when he had the children for the weekends, he would take them to school on Monday mornings. But, when asked later, the father testified he only learned J.B.'s teacher's name during the stepfather's testimony and then admitted, "I don't even know what school my kid even goes to." The father agreed he never attended a parent/teacher conference and does not have any knowledge about J.B.'s grades. He also does not schedule or attend doctor appointments for J.B and testified he was not aware of any health issues with which J.B. may have been diagnosed.

---

[3] There is no custody or visitation order in this case; visitation between the father and J.B. has been at the parents' discretion.

When the father was asked specifically about whether J.B. has been diagnosed with attention deficit hyperactivity disorder, the father said he knew about that. The father admitted he did not buy J.B. a birthday or Christmas present in the year leading up to the trial and agreed he only communicates with J.B. at visits—no phone calls, emails, or letters.

The mother introduced into evidence the father's child support payment record, which showed the father was $3275 in arrears—for his combined obligation for the oldest child and J.B. At the first day of the trial, the father testified he was employed for the last three months and was working fifty to sixty hours per week, earning $14 per hour. However, he had not updated the Child Support Recovery Unit regarding his recent employment, made any payments toward his back child support, or otherwise financially assisted the mother for J.B.'s needs. This was the father's first job since he was employed for a short stint in 2020; the child-support record shows the father had wages withheld from only two paychecks in 2020. During cross-examination, the father testified:

> Q. Okay. You'd agree that you have the ability to work right now? You don't have any physical ailments? A. No, I don't.
> Q. Don't have any mental disabilities that prevent you from working? A. No, I don't.
> Q. And in the past, have you ever suffered from any physical disabilities that have prevented you from working? A. No, I haven't.
> Q. If you can quantify since 2015, have you been employed more often than not or less often? A. It's in between.

In the eleven days between the first and second day of trial, the father was arrested for possession of methamphetamine, second offense; possession of drug paraphernalia; and a probation violation. He was held in jail a number of days and lost his job as a result. The father admitted to previously purchasing

methamphetamine. But when asked about the new, outstanding charges, the father denied that the methamphetamine found in the vehicle belonged to him. And when the mother's attorney began to ask the father about the drug paraphernalia, the father's attorney interjected, and the father spoke with his attorney off the record. When he returned, the father invoked his right not to incriminate himself. The court confirmed the father would not answer any further questions about the pending charges, and then the mother's attorney moved onto a different topic.

The paternal grandmother also testified at trial, stating she and J.B.'s mother had been close friends before the mother filed the petition to terminate the father's rights—which took place in March 2021. She testified she no longer gets along with the mother "since this custody issue stuff, but before that, she was like my best friend, and then her whole attitude changed. We would do garage sales, barbecues, I've went to her mom's house . . . , but since all this, no. We don't have no contact. We don't talk. We don't do nothing." Yet she also testified the mother contacted her in April and asked her to figure out how much it would cost for the mother to divorce the stepfather.

The GAL filed a report with the court, in which she supported granting the mother's petition to terminate. She noted the father was "behind on his child support obligation and has made minimal efforts since 2019 to stay current and/or get caught up on" the obligation. She explained that J.B. sees his stepfather as his "dad" and calls him that. J.B. expressed that he wants to be adopted by his stepfather and take his stepfather's name; the stepfather "has been the constant in [J.B.'s] life since he was approximately one-year old."

In a written ruling, the district court denied the mother's petition to terminate the father's rights, stating in part:

> In general, the three boys ([J.B.] and his two brothers) would go to [their paternal great-grandmother's] residence on a once a month or perhaps more frequent basis. Sometimes not all three of the boys would go on each visitation.
>
> . . . .
>
> [The mother] argues that the facts establish that [the father] has abandoned [J.B.] in several respects. First, [she] contends that [the father] has not financially contributed toward [J.B.'s] support by paying his court ordered child support obligation in full. In reviewing the evidence presented, while it is clear that [the father] has not paid 100% of the child support he owes, he has paid approximately 90% of his child support obligation. [The mother] correctly points out that [the father's] payments are irregular and mostly the result of withheld tax refunds. As a result, [she] does not have the benefit of regular payments. Nevertheless, the Court concludes that [the father] has substantially complied with paying for the reasonable support of [J.B.] Consequently, [the mother] has not proved by clear and convincing evidence that [the father] has failed to reasonably financially support [J.B.]
>
> [The mother] next contends that [the father] has abandoned [J.B.] by failing to visit [him] at least monthly and by failing to regularly communicate with [him]. The evidence was clear that [the parents'] relationship is strained. They do not effectively co-parent. [The mother] responsibly provides for all [J.B.'s] healthcare and educational needs without any assistance from [the father] who seems to have little interest in [the child's] healthcare and educational needs. [The father] attempted to explain this disinterest in two ways. First, he testified that he trusts [the mother] to appropriately provide for [J.B.'s] needs. Secondly, [he] explained that due to his poor relationship with [the mother], and in an effort to avoid further confrontations with her, he simply allows [the mother] to take care of such matters to her satisfaction and he does not question her. While perhaps not the most responsible choice, the Court found [the father's] explanation to be a credible explanation albeit a misguided view of his responsibilities as a co parent.
>
> . . . It seems clear that within the past year, [the father] has seen [J.B.] less frequently than one time a month, however, it may be approaching once a month on average that he sees [the child].
>
> . . . .
>
> [The mother] has the burden of proof in this case. After hearing all of the evidence, the Court cannot conclude that [she] has shown by clear and convincing evidence that [the father] has abandoned his child within the meaning of § 600A.8(3)(b). [The

father] certainly has had contact with [J.B.], limited though it may be. [He] loves and cares for [J.B.]. Therefore, on the record presented, the Court cannot conclude that clear and convincing evidence supports a finding that [the father] has not maintained "substantial and continuous or repeated contact with the child." . . .

. . . .

In this case, [the mother's] main argument for finding that termination is in [the child's] best interest is that [he] considers his stepfather his "Dad" and he wants his stepfather to adopt him. However, the stability of [the mother's] and [stepfather's] marriage was seriously called into question by the testimony of [the paternal grandmother]. She indicated that as recently as a few months ago [the mother] was exploring getting a divorce from [the stepfather]. While [the mother] unequivocally denied this allegation, [the grandmother] was firm in her testimony and the Court cannot conclude that she was not credible. The possibility that [the stepfather] will not be a part of [J.B.'s] future certainly cuts against a finding that termination of parental rights is in [J.B.'s] best interests.

In analyzing the best interest of the child in this case, the Court finds dispositive the forward-looking component of the analysis. Looking to [the father's] future prospects, even though his recent arrest caused him to lose his job, he has done a good job in the past finding new employment. Accordingly, the Court believes [the father] will be able to quickly secure another job and be able to continue supporting [the child] financially. This conclusion is supported by [the father's] past positive work history and history of substantial compliance with satisfying his child support obligation. However, a child needs more than financial assistance. A child needs to have his emotional needs met as well.

In considering [the father's] ability to provide for [J.B.'s] emotional needs in the future, the Court finds significant that [the father] has been able to maintain a positive relationship with [the oldest child]. In fact, the evidence was clear that when [J.B.'s] older brother was asked by [the mother] if he wanted to also ask to have his father's right terminated, he refused. It seems probable that as [J.B.] grows older he will follow his brother's lead and develop a closer bond with his father. [The father] certainly has room to improve in his interactions with [J.B.], but as [his] positive relationship with his older son makes clear, [the father] is capable of developing a closer bond with [J.B.]

Finally, the Court is gravely concerned that termination will result in a severance of [J.B.'s] positive relationship with his paternal grandmother and great-grandmother. There was no evidence presented to suggest that [the father's] mother and grandmother have been anything but a positive influence in [J.B.'s] life. They are clearly bonded with [him]. However, after these proceedings were initiated, contact between [J.B.] and his extended family ceased. The

Court cannot conclude that cutting off contact with his extended family is in [the child's] best interests. Especially given the fact that his older brother plans to continue to maintain contact with his extended family in the future.

. . . .

In conclusion, the Court determines [the mother] has not established by clear and convincing evidence that the best interests of [J.B.] will be served by terminating his father's parental rights. The Court's finding is not to suggest that [the father] does not have deficiencies in his parenting that need to be addresse[d]. [The father] clearly needs to take a more active role in arranging for visitation with his son. [He] needs to become more invested in [J.B.'s] healthcare and education. [He] needs to work to develop a stronger bond with [J.B.] His failure to do so going forward may lead the Court, upon proper petition, from reaching a different result.

The mother moved the court to reconsider, which the court denied.

The father's appointed attorney filed an invoice for his attorney fees, totaling $2937.17, which the mother resisted. She argued the father lied to the court, as his May 13, 2021 financial affidavit claimed he earned zero dollars in the prior twelve months, while his June 14 testimony was that he had been employed the last three months, working fifty to sixty hours per week and earning $14 an hour. She also claimed the father's late request for counsel caused her to incur additional fees and miss additional work and that this fact, combined with the father being more than $3000 behind in child support, meant it was not reasonable for her to pay his attorney fees. Finally, in the alternative, she asked the court to cap her responsibility at the court-appointed rate of $63 per hour.

Citing Iowa Code section 600A.6B(1), the court ruled it was "clear that [the mother] is required to pay [the father's] attorney fees in this case. The Court has no discretion to order otherwise." The court set the attorney fee hourly rate at $63 per hour and ordered the mother to pay $1017.17 for the father's attorney fees plus expense. The mother appeals.

## II. Standard of Review.

"Private termination proceedings under chapter 600A are reviewed de novo." *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). "The Iowa legislature requires the best interest of the child to 'be the *paramount consideration* in interpreting' the private termination of parental rights." *Id.* (quoting Iowa Code § 600A.1).

## III. Discussion.

### A. Termination.

Private termination proceedings are a two-step process. *Id.* First, the petitioning parent must prove by clear and convincing evidence the statutory ground for termination of parental rights. *Id.* And second, the parent must prove termination is in the child's best interests. *Id.*

#### 1. Abandonment.

The mother claimed the father abandoned J.B. pursuant to section 600A.8(3)(b), which provides that a parent has abandoned their child, who is six months of age or older, *unless*

> the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, *and* as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.[4]

---

[4] There is a third subsection, which is inapplicable here, as it involves cases when a parent has openly lived with the child within the one-year period immediately preceding the termination trial.

(Emphasis added.)

Under this subsection, "the threshold element of 'substantial and continuous or repeated contact' is economic contributions." *In re K.W.*, No. 14-2115, 2015 WL 6508910, at *3 (Iowa Ct. App. Oct. 28, 2015). In other words, a parent who has failed to "contribut[e] toward support of the child of a reasonable amount" has abandoned their child. *See id.* ("Because [the father] is deemed to have abandoned his child under the financial support element, we need not consider whether [the mother] prevented [him] from visiting or having regular communication with [the child] under subparagraphs (b)(1) and (2).").

Here, the district court looked more favorably on the father's financial contributions than we do. The court decided the fact the father has paid 90% of what he owes for his court-ordered child-support obligation means the father "has substantially complied with paying for the reasonable support of" J.B. Relying on this, the court concluded the mother failed to prove by clear and convincing evidence that the father failed to reasonably support the child.

But "section 600A.8(3) is not limited to court-ordered support payments; those types of payments are the subject of a separate provision." *In re W.W.*, 826 N.W.2d 706, 711 (Iowa Ct. App. 2012) (citing Iowa Code § 600A.8(4)); *see also In re T.K.*, No. 16-0029, 2016 WL 4384869, at *2–3 (Iowa Ct. App. Aug. 17, 2016) (finding the father, who consistently paid court-ordered child support of $10 per month, did not contribute reasonable support under section 600A.8(3).). Instead, the analysis under section 600A.8(3) is whether the parent has provided "contribution toward support of the child of a reasonable amount." In making this

decision, we believe we should consider both the parent's contribution in relation to the cost of raising a child and the parent's reasons for not providing that level of support. *Cf. In re C.M.-G.*, No. 16-0718, 2016 WL 7393929, at *4 (Iowa Ct. App. Dec. 21, 2016) (concluding mother's support of unemployed paramour while making only four, sporadic child-support payments "fell well short of a reasonable contribution to the support" of the child); *T.K.*, 2016 WL 4384869, at *2–3 (concluding consistent support of $10 each month was not reasonable, even though father was not "fully employed" and noting father's recognition that "[$10] a month is well below the amount needed to financially support a child").

In this case, the father's child-support obligation was reduced to $50 per month in March 2017 at his request.[5] The father's obligation is small because he is not consistently employed, even though—according to his own testimony—there is nothing preventing him from it. Even though his obligation was limited to $600 per year for the more than four years leading up to the termination trial, the father was still approximately $3000 in arrears as of June 2021.[6] And the father testified his only financial support of J.B. is through his child-support obligation; he does not voluntarily send the mother money.

At the first day of the June 2021 trial, the mother introduced into evidence the child support payment record. It showed the father had paid only $71 in child support in 2021 through April 21, all of which came from his federal tax refund that

---

[5] We recognize this is the father's support payment based on two children, only one of whom is at issue in this termination-of-parental-rights case.
[6] From August 2014 (when the first child-support order was entered) until February 2017, the father was ordered to pay $762 per month total for both of his biological children. After the father lost his steady employment in 2017, he asked to have his obligation reduced.

was intercepted and none from employment. Yet the father testified he was employed and working fifty to sixty hours per week in the three months leading up to the hearing. The father agreed he was earning approximately $2800 a month during this time period. But he did not contact the Child Support Recovery Unit to provide his updated employment information, and he had made no child support payments during this time period. He also did not provide the mother any financial assistance outside of his child-support payments. By the second date of the termination trial, June 25, the father had been fired from his job after being arrested and spending a number of days in jail.

Unlike the district court, we do not find the father's minimal, sporadic child-support payments constitutes "contribution toward support of the child of a reasonable amount."[7] A parent is deemed to have abandoned their child unless they both make reasonable financial contributions and maintain monthly contact, so the mother only needed to prove the father failed at one of the two prongs to show he abandoned J.B. *See* Iowa Code § 600A.8(3)(b); *K.W.*, 2015 WL 6508910, at *3.

However, we consider the father's contact with J.B. just to point out that the district court made a factual finding "that within the past year, [the father] has seen [J.B.] less frequently than once a month." The court then concluded the mother failed to prove the father abandoned J.B. because the father "certainly has had contact with [J.B.], limited though it may be. [He] loves and cares for [J.B.]." But

---

[7] From September 1, 2019 to April 21, 2021, the father made only four child-support payments. One of these payments was the collection of a $1200 stimulus payment in 2020 and another was the collection of his 2021 tax refund. Only two payments came from wage withholding.

the statute requires a parent to maintain monthly contact to not have abandoned the child.  *See* Iowa Code § 600A.8(3)(b)(1).  The father does not get the benefit of the doubt because he sees the child once in a while; abandonment under section 600A.8(3) does not require total desertion.  *See In re Goettsche*, 311 N.W.2d 104, 105 (Iowa 1981); *see also* Iowa Code § 600A.2(20) (defining "to abandon a minor child" to mean "that a parent . . . rejects the duties imposed by the parent-child relationship, . . . which may be evinced by the person, while being able to do so, making no provision or making *only a marginal effort* to provide for the support of the child or to communicate with the child" (emphasis added)).  Plus the father's subjective feelings toward J.B., when not backed up by perceivable actions, are inapposite.  *See* Iowa Code § 600A.8(3)(c) ("The subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of acts specified in paragraph 'a' or 'b' manifesting such intent, does not preclude a determination that the parent has abandoned the child.").

The mother proved the father abandoned J.B.

**2. Best Interests.**

Next, we must determine whether terminating the father's parental rights is in J.B.'s best interests.

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent.  In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1(2). In determining what is in J.B.'s best interests, we look to the father's past performance, "for that performance may be indicative of the quality of the future that parent is capable of providing." *B.H.A.*, 938 N.W.2d at 233 (citation omitted).

Up to this point, the father's involvement with J.B. appears to be limited to the times the great-grandmother schedules a visit and J.B. visits her home to see her. The district court gave the father credit for using his family members as "intermediaries" to set up his visits with the child so as to avoid conflict with the mother, but the GAL's report stated the father "does not know that the child is coming over until someone else tells him." And the grandmother, when asked, testified the father never asked her to set up visits with J.B. so he could see him. The father's lack of interest in parenting J.B. was also apparent when he testified that though he lives in the same city as J.B., he does not know what school J.B. attends. The father also could not name J.B.'s teacher or testify about his progress in school. The father's lack of knowledge about some of the basics of J.B.'s day-to-day life supports the testimony of the mother and stepfather and statements made in the GAL's report that, even when J.B. does visit the great-grandmother's home, the father is not always present or involved with J.B.

The district court noted the father's recent arrest and charges for possession of methamphetamine, second offense, and possession of drug paraphernalia but pointed out that the father is innocent until proven guilty; the court noted it had no evidence before it to establish the father's guilt. But "[a] trial court may infer in a civil case that a party's refusal to answer based on a claim of privilege against self-incrimination that the answer would be adverse to the party."

*Craig Foster Ford, Inc. v. Iowa Dep't of Transp.*, 562 N.W.2d 618, 623–24 (Iowa 1997) (citation omitted). We do not opine as to the father's ultimate guilt or innocence on the outstanding charges, but we also do not ignore his recent arrest for possession of methamphetamine—especially when the father admitted to past methamphetamine purchase and use—and also the impact it had on the father's employment when considering J.B.'s best interests.

The district court seemed to believe that J.B. would "grow" into a relationship with the father because J.B.'s oldest brother sees the father more often and communicates with him via phone between in-person visits; it seemed hesitant to deprive J.B. and the father of this opportunity. But we think the relationship between the oldest child and the father is less likely a product of the sixteen-year-old's age and more likely due to the fact that the oldest child was approximately nine when the father moved out of the family home for the last time, while J.B. was one. Using the past as a predictor for the future, we cannot assume the father will take an interest in a parenting relationship with J.B. *See B.H.A.*, 938 N.W.2d at 234 ("Aside from speculation that Dad may develop an active relationship with [the child] in years to come, the record is virtually devoid of any meaningful evidence that terminating Dad's parental rights would be detrimental to [the child] due to any alleged closeness of relationship."). "Small gestures to sustain a relationship with a child are [not] enough to show that termination of parental rights is not in the child's best interests." *In re L.H.*, No. 16-1653, 2017 WL 1278336, at *3 (Iowa Ct. App. Apr. 5, 2017).

The district court decided termination of the father's rights is not in J.B.'s best interests. The court seemed to rest its decision entirely on the potential

relationship it believed J.B. and the father could have; the court was reluctant to foreclose that possibility. But in determining what is in J.B.'s best interests, section 600A.1(2) requires that we consider whether the father has affirmatively assumed the duties of being a parent. And he has not. For that reason, and all of the other reasons we discussed, we conclude termination of the father's rights is in J.B.'s interests.

In reaching this decision, we note the mother testified that even if the father's rights were terminated, she would continue to allow J.B. to have a relationship with the paternal grandmother and great-grandmother. We believe the mother will follow through with this claim, as the oldest brother will continue to share legal ties and a personal relationship with the father and his family. Plus the middle child has always shared a relationship with the father's family in spite of the fact the child is not technically related to them. While the relationship between the mother and the paternal relatives seemed to sour after the mother filed the termination petition, we have often recognized that relationships that were strained during family law litigation will likely improve once the case is finished. *See, e.g.*, *Dietz v. McDonald*, No. 08-0129, 2008 WL 5234524, at *7 (Iowa Ct. App. Dec. 17, 2008) ("We, like the district court, believe that the parties' communication will rebound and their level of conflict will decrease as the stress of . . . this litigation ends.").

Because the mother proved the father abandoned J.B. and that termination of the father's parental rights is in J.B.'s interest, we reverse the district court's denial of the mother's petition.

**B. Appellate Attorney Fees.**

The mother maintains she should not be required to pay for the father's appellate attorney fees. Iowa Code section 600A.6B(1) states:

> A person filing a petition for termination of parental rights under this chapter *shall be responsible for the payment of reasonable attorney fees* for services provided by counsel appointed pursuant to section 600A.6A in juvenile court or *in an appellate proceeding initiated by the person filing the petition* unless the person filing the petition is a private child-placing agency licensed under chapter 238 or the court determines that the person filing the petition is indigent.

(Emphasis added.) And section 600A.6A(1) gives the parent identified in a chapter 600A termination petition—in this case, the father—the right to counsel. "If the parent against whom the petition is filed desires but is financially unable to employ counsel, the court shall appoint counsel for the person if the person requests the appointment of counsel and the court determines the person is indigent." Iowa Code § 600A.6A(2). Here, the father was appointed counsel in the district court proceedings and, as far as we can tell, the same counsel continues to represent him. So if the father incurred fees in this appellate proceeding, the mother would be required to pay for the reasonable fees; the matter is not within our discretion. *See Id.* § 600A.6B(1) (providing the petitioner "*shall be* responsible for the payment of reasonable attorneys fees" incurred "in an appellate proceeding" (emphasis added)); *In re Detention of Fowler*, 784 N.W.2d 184, 187 (Iowa 2010) ("In a statute, the word 'shall' generally connotes a mandatory duty."); *State v. Klawonn*, 609 N.W.2d 515, 522 (Iowa 2000) ("[W]e have interpreted the term 'shall' in a statute to create a mandatory duty, not discretion.").

However, the father filed neither an appellate brief nor a waiver of briefing. And oral argument was not heard in this case. Without an appellate brief or oral

argument—and where the father made no request for appellate fees—we conclude there are no reasonable appellate attorney fees for the mother to pay.

**IV. Conclusion.**

We reverse the district court's denial of the termination petition and remand for entry of an order consistent with this opinion. *See B.H.A.*, 938 N.W.2d at 236 (concluding "chapter 600A's best-interest factors weigh in favor of terminating Dad's parental rights" and "revers[ing] the judgment of the juvenile court and remand[ing] for entry of an order consistent with this opinion"). We conclude there are no reasonable appellate attorney fees for the mother to pay.

**REVERSED AND REMANDED WITH DIRECTIONS.**